CRESTWOOD PLAZA, INC., Respondent,

v.

The KROGER CO., and Tipton Electric Company, Appellants.

Nos. 35866, 35867.

Missouri Court of Appeals,
St. Louis District,
Division One.

Dec. 10, 1974.

Motion for Rehearing or Transfer to Supreme Court Denied Feb. 7, 1975.

Rehearing Denied April 14, 1975.

Byran, Cave, McPheeters & McRoberts, Robert G. Brady and Michael B. McKinnis, St. Louis, for respondent.

Luke, Cunliff, Wilson, Herr, Chavaux & McCluggage, for appellant Kroger Co.

Julius H. Berg, St. Louis, for appellant Tipton Electric Co.

CLEMENS, Judge.

Suit for declaratory judgment and injunction by plaintiff-landlord Crestwood Plaza, Inc., to void both its shopping center lease to Kroger Company and Kroger's sublease to Tipton Electric Company. The issue was whether Kroger had the right to sublet the leased premises to Tipton. The trial court said not and Kroger and Tipton appealed. We reverse.

Crestwood contends in Counts I and IV that since its lease to Kroger provided for base rental plus a percentage of Kroger's retail sales, the lease impliedly prohibited subletting and restricted Kroger's use of the premises to that of a retail food supermarket. In Count II, Crestwood contends the lease was terminated when Kroger vacated the leased premises. Finally, in Count III Crestwood contends Kroger's lease was terminated by an oral agreement.

The facts: Plaintiff corporation is controlled by the Zorensky brothers, Milton and Louis, a lawyer, who decided in 1954 to develop the Crestwood Plaza Shopping Center. They prepared a plat for prospective tenants showing the proposed layout and contacted Kroger's St. Louis real estate manager. After several months of discussions Kroger proposed a written lease and rider. The Zorenskys studied the proposal two months and returned it as the final lease to Kroger, whose branch manager signed it. After further negotiations the parties entered into a Modification Agreement detailing a new building layout and establishing the term of the Kroger lease from November 1, 1956 to October 31, 1968, with a provision for three five-year extensions at Kroger's option. Later, the Zorenskys assigned the Kroger lease to the plaintiff corporation of which they are the stockholders.

During discussions before executing the lease, rider and lease modifications, the parties reached various understandings and incorporated them into the written agreements. Among these were an agreement for a larger store than originally planned, a change in the store's location, the Zorenskys' agreement to prohibit other retail food stores within 1,825 feet of the Kroger store, the Zorenskys' promise to obtain leases with other retailers and their promise not to construct a theater or bowling alley without Kroger's consent. Negotiations pertaining to utility services, alterations and sewer district taxes were reduced to writing.

The only express restriction upon Kroger was that the premises "shall not be used for any unlawful purpose." Kroger's option to renew three times on the same terms was to be automatic unless Kroger notified Crestwood of its intention to terminate six months before any extended lease period. The lease permitted Kroger to remove its fixtures at any time. It further provided the lease should bind and inure to the benefit of the parties, their successors and assigns.

Kroger agreed to pay a basic monthly rental of $2,320 and additional annual rental of 1% of its yearly sales in excess of $2,670,000. The parties agreed in the event Kroger "voluntarily vacates the premises prior to the expiration of the lease term or any renewal thereof, the rental for the remaining period of the lease shall be at a rate equal to the average rental including percentage paid over the previous 36 months for the remainder of the term of the lease." Kroger never owed any percentage rent because of its low business volume.

Another base provision with which Crestwood complied required Crestwood to build a standard one-story building with Kroger's store front, according to specifications prepared by Crestwood and approved by Kroger.

From March, 1957 until November, 1972 Kroger operated a retail food market on the premises. Kroger vacated the store when it opened a larger store across the street in the Crestview Shopping Center. Meanwhile the Crestwood Shopping Center had been enlarged. By 1966 its character and "tenant mix" had changed with the addition of two major department stores; as a result, Kroger's store was no longer at the east end of the shopping center. Kroger felt the new stores created detrimental traffic and parking problems. When the parties could not agree who would bear the expense of remodeling Kroger's store, Kroger informed the Zorenskys it would relocate. In September, 1972 Kroger wrote Louis Zorensky it had begun sublease negotiations with Tipton.

Crestwood wanted to purchase Kroger's lease. When the parties reached no accord, Kroger sublet its store to Tipton. Although Kroger continued paying the base monthly rental, Crestwood brought this action to terminate Kroger's lease.

Crestwood's petition was in four counts. In Count I Crestwood asked the court to declare Kroger had no right to sublet without Crestwood's consent, this due to an alleged intent when the lease was executed. Crestwood also sought a declaration that Tipton required Crestwood's consent to occupy the premises. In Count II Crestwood alleged the parties orally agreed to end the lease December 31, 1972 and sublessee Tipton had no right to possession after January 1, 1973. In Count III Crestwood sought a declaration that Kroger's vacating the premises in 1972 extinguished its right to renew the lease for five-year periods. In Count IV Crestwood prayed for a declaration that the lease's terms permitted use of the premises for a retail food store and for no other purposes.

Crestwood and Kroger had tried to agree on terminating the lease since neither wanted to continue using the store as a food market. Crestwood offered to pay Kroger to cancel the lease rather than sublet the premises because Crestwood wanted to remodel and rent to higher-paying tenants. Kroger wanted to keep its lease so it could sublet to Tipton at a higher rental. Both were seeking financial advantage, and this right-to-sublet issue stemmed from their inability to agree. We need not weigh the asserted equities; the issue is one of law.

*Kroger's Right to Sublet.* In Counts I, III and IV Crestwood asked the trial court to "construe" the Kroger lease, and the court did so by considering extraneous facts. Courts do that when necessary to resolve ambiguities in a written instrument, but the best indication of contracting parties' intent is their own words. Here, the parties were learned in the ways of commerce and the law and chose their

words after unhurried and deliberate negotiations. We can and do *interpret* their words by their ordinary meanings. We need not seek extraneous facts to *construe* the Kroger lease. As was said in Leggett v. Missouri State Life Ins. Co., 342 S.W.2d 833 [11–12] (Mo. banc 1961): "If the terms of a contract are clear and unambiguous the contract will be enforced or given effect in accordance with its terms, and without resort to construction to determine the intention of the parties. . . . When the language of a contract is plain, there can be no construction because there is nothing to construe."

*Subletting.* We cannot agree with Crestwood's first contention, that its lease to Kroger impliedly prohibited subletting. The lease is silent about subletting.

We note the lease runs to Kroger, "its successors and assigns" and further declares its provisions shall "inure to the benefit of the parties thereto and their . . . successors and assigns." These words are explicit and of material significance. Cummins v. Dixon, 265 S.W.2d 386 [1–3] (Mo.1954); Garland v. Lisseta Inv. Co., 234 S.W.2d 347 [3] (Mo.App. 1950).

We also note § 441.030, RSMo 1969, V.A. M.S., which provides: "No tenant for a term not exceeding two years, or at will, or by sufferance, shall assign or transfer his term or interest, or any part thereof, to another without the written assent of the landlord . . . ." By necessary implication, long-term tenants may transfer their interest.

Kroger's right to sublet is based both on the presence in the lease of the words "successors and assigns" and the absence of any restriction on that right. Crestwood concedes the general rule that absent lease provisions to the contrary, Kroger had an absolute right to sublet to Tipton but "percentage rental shopping center leases . . . clearly constitute an exception to that rule."

In a situation where there is a percentage lease and the lessee is required to pay both a substantial guaranteed minimum rent plus a percentage of the sales, it has been held that, in the absence of a provision forbidding subletting, subletting is not precluded even though a portion of the rent is computed on the basis of percentage of income. There is some authority that such an arrangement does not make the lease a personal undertaking so as to preclude subletting where there is a provision for a substantial fixed minimum. McFadden-Deauville Hotel, Inc. v. Murrell, 182 F.2d 537 (5th Cir. 1950); see also Annot., 38 ALR 2d 1113, 1117–1118 (1954). This type of lease became popular in the 1930's when lessors believed the depression would be short lived and sought a mechanism for recovery of reasonable rents once economic recovery began. The purpose of such a lease is to gear the lessor's return to the productivity of the location of the property and to adjust rental automatically as the value of the dollar fluctuates in the swing of the business cycle. Note, The Percentage Lease—Its Functions and Drafting Problems, 61 Harv.L.Rev. 317, 318 (1947). Hence a percentage-rental lease does not preclude subletting. Furthermore, the percentage-rental question in this case is not determinative of the issues presented here.

For sixteen years Kroger had paid only the base $2,320 monthly rental; it still does so. Kroger never owed Crestwood percentage rental and now that it has vacated the premises, Kroger will never become liable for percentage rental.[1] Crestwood has extensively briefed the issue of a percentage rental exception to the general rule permitting subleasing. But none of the cited cases present facts akin to this case in which one of many independent tenants in a shopping center agreed to pay a definite substantial monthly rental plus a conditional percentage-of-sales rental.

We hold that the unambiguous terms of Crestwood's lease gave Kroger the right to do what it did—sublet the premises to Tipton. We bear in mind that we grant injunctions sparingly and only to restrain acts which constitute real injury. Cissell v. Brostron, 395 S.W.2d 322 [1–3] (Mo.App.1965). And declaratory judgment action should determine a justiciable rather than a hypothetical issue. Absher v. Cooper, 495 S.W.2d 696 [2–3], (Mo.App.1973).

The trial court erred in holding on Count I that the lease impliedly prohibited Kroger's sublease to Tipton.

*One-Purpose Use.* Crestwood extended its Count I contentions in Count IV by arguing the lease impliedly restricted subletting because it impliedly limited Kroger's use of the premises to a retail food supermarket. This points lacks merit. When a lease expressly stipulates a single-purpose use, a lessee is bound thereby. But a provision permitting a particular use, as here, is not to be interpreted as a single-purpose restriction. Soulway Realty Co. v. Machalek, 17 S.W.2d 682 [1] (Mo.App.1939). The only express restriction upon Kroger limits its uses to those which are lawful. Absent other express restrictions, a lessee is free to use the premises in any lawful manner. References here to a "retail food supermarket" are merely descriptive of one possible use of the premises.

Crestwood contends a single-purpose restriction is also inferable from Crestwood's willingness to accommodate Kroger. A restriction is not inferable from the mere fact the parties bargained for certain construction features. But even if we assume the parties originally intended the premises to be a supermarket, a lessee may sublet for any purpose absent an express lease restriction. Moore v. Guardian Trust Co., 173 Mo. 218, 73 S.W. 143, 150 [¶ 2] (Mo.1903).

---

1. As noted *supra*, the lease provided that if Kroger vacated the premises before full term —which it has done—rental for the remaining period shall be at a rate equal to the average paid over the previous 36 months. That would include the base monthly rental, but not the percentage rental, since none was ever paid.

Implied obligations rest upon the presumed intentions of the parties as gathered from their written contracts. A covenant will not be implied merely because without it the contract would be unwise. Conservative Federal Savings and Loan Association v. Warnecke, 324 S.W.2d 471 [2, 3, 4] (Mo.App.1959). Nor will the court find an implied covenant if the parties have either dealt expressly with the matter or have intentionally left the contract silent on the point. Glass v. Mancuso, 444 S.W.2d 467 [8] (Mo.1969). Crestwood and Kroger negotiated their lease deliberately, thoughtfully and extensively. They intentionally restricted the lessee's uses to lawful uses. We therefore consider the matter of restrictions to have been discussed and the parties' intentions to have been incorporated into the contract. We decline to rewrite the contract in order to supply a negative covenant. So-Good Potato Chip Co. v. Frito Lay, Inc., 462 F.2d 239 [4, 5] (8th Cir. 1972).

*Oral Cancellation.* The trial court's finding that Kroger and Crestwood contracted orally to cancel their lease by October 31, 1972 was contrary to the overwhelming weight of the evidence.[2] Count II of Crestwood's pleadings states the parties contracted orally and in writing to end the lease December 31, 1972. The record discloses no such agreement.

The record shows that in 1968 Kroger's representatives requested and obtained Milton Zorensky's assistance in Kroger's effort to relocate. The trial court inferred Zorensky cooperated in return for Kroger's promise to surrender its leasehold rights. But there was no evidence of Kroger's promise to terminate. The court could as logically have found a different reason for Zorensky's cooperation:

"Q. . . . is it true that you were rather glad, or would be glad if Kroger did

move out? . . . it would have benefitted your center, wouldn't it?

"(by Zorensky) Certainly, because Kroger was not remodeling. A new center being built, if you do not improve your property, your property goes down."

Until December, 1972 Crestwood appeared anxious to buy Kroger's leasehold rights or prevent Kroger from subletting. But negotiations never culminated in a mutual understanding.

A valid contract requires a distinct intention common to both parties. Here, we find no evidence whatever of any "meeting of the minds." Macy v. Day, 346 S.W.2d 555 [1, 2] (Mo.App.1961). Crestwood's assisting Kroger to relocate was not an agreement to terminate the lease. We cannot infer from the record that Kroger promised to cancel in exchange for Zorensky's assistance. Nor does the record warrant a finding that negotiations to terminate a lease are tantamount to a contract to terminate. In short, Crestwood failed to prove the existence of an oral termination agreement as pleaded.

We note in addition that Crestwood's post-1968 conduct was inconsistent with the asserted reliance on an oral contract to cancel the lease. The parties always wrote down agreements relating to the lease, including such minor questions as insurance and sewer tax payments. Yet no writing ever mentioned the existence of a supposedly vital oral agreement to terminate the lease. To the contrary, correspondence concerned Kroger's desire to sublet and Crestwood's desire to prevent it or buy the leasehold rights. Such conduct compels the conclusion the parties were well aware of the lease stipulated requiring six months' prior written notice to effect cancellation; notice was never given.

*Vacating the Premises.* The trial court erred in finding Kroger terminated the lease

2. Although we give deference to the trial court's finding of facts, Rule 73.01(d), V.A.M.R., we must independently determine them; in so doing we must consider secondary facts which shed light on the factual issue. Wright v. Northwestern National Ins. Co. of Milwaukee, 441 S.W.2d 727 [1, 3] (Mo.App. 1969).

by vacating the building. The error resulted from a confusion between the words "vacate" and "terminate." Two provisions in the lease govern. The lease rider provides: "In the event Lessee voluntarily vacates the premises prior to the expiration of the Lease Term or any renewals thereof, the rental for the remaining period of the Lease shall be at a rate equal to the average rental including percentage paid over the previous thirty-six (36) months for the remainder of the term of the lease."

Another lease paragraph provides for a twelve-year term with three optional renewals. Renewals were to be automatic unless Kroger gave Crestwood six months' prior written notice of its intent to terminate the lease.

Although the lease rider mentions the lease term and renewal periods, its concern is not with the lease's duration but with rent computation. The parties initially believed Kroger would be paying both a base rent and a percentage rent. To assure Crestwood of continued base rent if Kroger voluntarily vacated the premises before expiration of the original term or any renewal term, the rider provided a means of computing rent for the unexpired term.

But the lease and rider nowhere equate vacating the premises with terminating the lease. The separate provision deals with the only express means of terminating: six months' prior written notice of intent to terminate. Vacating premises is not synonymous with abandoning a lease, and the lease itself warrants no such interpretation. National Alfalfa Dehydrating and Milling Company v. 4010 Washington, Inc., 434 S.W.2d 757 [14, 15] (Mo.App. 1969).

The trial court erred in finding Counts I, II, III and IV in Crestwood's favor. The decree therefore is reversed and the cause remanded with instructions to deny Crestwood's petition for injunction and declaratory judgment, to enter a new decree in accordance with this opinion, and for further proceedings on defendant's counterclaims, which the trial court ordered separately tried.

DOWD, C. J., and SIMEONE and RENDLEN, JJ., concur.